1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

CLARK R. ARMSTRONG,                )       CASE NO. C15-5071-BJR
                                    )
          Plaintiff,                )       ORDER GRANTING DEFENDANTS'
                                    )       MOTION FOR SUMMARY JUDGMENT
     v.                             )       AND DEFENDANTS' MOTION
                                    )       TO STRIKE
                                    )
PIERCE COUNTY, et al.,              )
                                    )
          Defendants.               )
_____)

# I.    INTRODUCTION

Plaintiff Clark Armstrong brings the present action alleging that Defendants violated his

First, Fourth, Fifth, and Fourteenth Amendment rights protected by 42 U.S.C. § 1983—as well as

state laws prohibiting battery, false arrest, false imprisonment, and intentional infliction of

emotional distress—when they encountered and ultimately arrested him in the Pierce County

Courthouse on February 7, 2013. Pl's Second Am. Compl., Dkt. 36.[1]  Defendants move for

summary judgment, seeking dismissal of Plaintiff's claims.  Defendants argue, in part, that the

---

[1] Plaintiff, in his Complaint, also alleges tort violations under the Washington State Constitution. Dkt 36 ¶ 4.10.
Defendants, in their motion for summary judgment, assert that there is no private cause of action under the state
constitution. Dkt. 37 at 39 (citing *Brock v. Washington State Dep't. of Corr.*, 2009 WL 3429096 at *6 (W.D. Wash.
2009)).  Plaintiff, in his opposition, concedes this point. Dkt. 43 at 25.  Accordingly, Plaintiff's state constitutional
claims are dismissed.

named employees of Pierce County acted reasonably and/or are otherwise immune from suit pursuant to the doctrine of qualified immunity.

Plaintiff opposes the motion.[2]  In support of his opposition, Plaintiff submitted, *inter alia*, three declarations that Defendants claim were specifically requested but not previously disclosed in discovery.  Accordingly, Defendants, in their reply brief, have moved to strike these declarations.  Plaintiff has not filed a sur-reply or a brief in opposition to Defendants' motion to strike.

Having reviewed the Complaint, the parties' briefs, the relevant case law, and the entire record, and finding no objection to Defendants' motion to strike, the Court grants Defendants' motion to strike and grants Defendants' motion for summary judgment.  The Court's reasoning follows.

## II.   DEFENDANTS' MOTION TO STRIKE

Plaintiff filed his Complaint in February 2015. Dkt. 45 at 3.  Pursuant to the Court's scheduling order, discovery was to be completed by May 23, 2016. *Id*. (citing Dkt. 35). Defendants served Plaintiff with interrogatories and requests for production in December 2015, seeking, in relevant part, the following information: the identities of Plaintiff's witnesses; summaries of these witnesses' expected testimony; and any documentary evidence relating to Plaintiff's claims. *Id*. (citing Dkt. 46-2, Ex. B: Pl's. Resp. to Req. for Produc. No. 7, No. 8; Pl's. Resp. to Interrog. No. 9)  In response, Plaintiff did not furnish any documents; rather, Plaintiff denied having any relevant documents other than documents that had already been disclosed by

---

[2] Defendants, in their motion, also argue that the named departments within Pierce County are not entities capable of being sued. Dkt. 37 at 9 (citing *Broyles v. Thurston County*, 147 Wn. App. 409, 427-28 (2008).  Pursuant to RCW 36.01.010, Defendants assert, the capacity to be sued is limited to the county itself. *Id*. (citing *Foothills Development Co. v. Clark County Board of Commissioners*, 46 Wn. App369, 377 (1986)).  Plaintiff, in his opposition, concedes this point. Dkt. 43 at 8 (citing *Nolan v. Snohomish Cty*., 59 Wash. App. 876 (1990)).  Accordingly, Plaintiff's claims against the Pierce County Prosecuting Attorney's Office and the Pierce County Sheriff's Office are dismissed.

2

the parties. Dkt. 46-2, Ex. B: Pl's. Resp. to Req. for Produc. No. 7, No. 8; Pl's. Resp. to Interrog. No. 9.   Thus, as of February 19, 2016, Plaintiff represented to Defendants that all relevant documentary evidence had already been produced.

As stated above, Defendants filed a motion for summary judgment on June 24, 2016.   In opposition to the motion, Plaintiff submitted—for the first time—three declarations prepared by individuals who claim to have witnessed some of the events at issue.[3] Dkt. 43-3, Exs. A, B, F. These declarations were written on or about February 7, 2013; and, according to the date reflected on the corresponding affidavits, which are on Plaintiff's counsel's letterhead, at least two of the declarations were provided to Plaintiff in March 2015, more than a year before the discovery deadline in this case. Dkts. 43-2, 43-3, and 43-7.   Thus, Defendants argue, "Plaintiff has purposefully withheld these statements and now ask this Court to rely on them as a basis to deny summary judgment and as a basis for discrediting the Defendants' expert," who, of course, had no opportunity to review these declarations. Dkt. 45 at 4.   Moreover, Defendants assert, these late disclosures "impacted" their ability to meaningfully depose Plaintiff. *Id*.   Accordingly, Defendants move to strike these declarations pursuant to Fed. R. Civ. Pro. 37(c)(1) and LCR 16(m)(1).   Plaintiff has not opposed the motion.

District courts are granted "particularly wide latitude . . . to issue sanctions under Rule 37(c)(1)." *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001). Fed. R. Civ. Pro. 37(c)(1) prohibits a party from using information it failed to provide opposing counsel "unless the failure was substantially justified or is harmless."   The Advisory Committee Notes describe the rule as a "self-executing" and "automatic" sanction designed to "provide a

---

[3] The declarations were written by the following three people: Jane Muhlstein Spencer; Martin J.H. Duenhoelter; and Irene S. Smith. Dkt. 43-3, Exs. A, B, F.

3

strong inducement for disclosure of material." Fed. R. Civ. P. 37 advisory committee's note (1993).

Here, Plaintiff has not alleged *any* justification for his failure to disclose these declarations during discovery. Furthermore, it is clear—from Plaintiff's own submission to the Court—that Plaintiff possessed these declarations since at least March 2015. Most importantly, Plaintiff has not opposed the motion to strike. Accordingly, the Court grants Defendants' motion to strike the Spencer, Duenhoelter, and Smith declarations.[4]

### III.   FACTUAL BACKGROUND

On February 7, 2013, Plaintiff Clark Armstrong, a 50-year old man who utilizes a cane because of a limp, was in a courtroom of the Pierce County Courthouse waiting for his criminal case to be called.[5] Compl. ¶¶ 3.2, 3.3; Dkt. 43-8. After Plaintiff's cell phone audibly rang in the courtroom, a judicial assistant asked Plaintiff to (temporarily) leave the courtroom. Pl's. Dep. 19:1-8. Plaintiff did so. *Id.*   While outside the courtroom, Plaintiff alternatively paced the hallways and stood directly across from a conference room off one of the hallways. *Id.* The door to the conference room was open and the room was occupied by Defendant Gerald Ham, a prosecutor with Defendant Pierce County Prosecuting Attorney's Office, and defense attorney Jane Spencer. Compl. ¶¶ 3.8, 3.9. Defendant Ham and Ms. Spencer were discussing a case.

Ham alleges that Plaintiff was "very vocal, loud, and cursing" while he was standing outside the conference room where Ham and Spencer were discussing their case. Ham Dep. 8:5-

---

[4] In considering the motion for summary judgment, therefore, the Court relies solely on the record properly before it. This record consists of deposition testimony given by Plaintiff and by each named Defendant; Plaintiff's responses to Defendants' pertinent discovery requests; and a video apparently depicting the events at issue.   Dkt. 38, Exs. A-H. Dkt. 43-1, Exs. C-E, G; Dkt. 40, Ex. 5.   Neither party, in its briefing, addresses the source of the video. *See* Defs.' Mot., Dkt. 37; Pl's. Opp., 43; Defs'. Reply, Dkt. 45.   Upon examination, it is clear that the video was captured by security cameras located on or near the ceiling of the hallway in the Pierce County Courthouse where the events transpired. *See* Dkt. 40.

[5] Plaintiff was charged in 2ZC002996 with Driving Under the Influence of Intoxicants and Driving While in Suspended or Revoked Status. Pl's. Dep. 115:6-10, Ex. 10.

4

11.  Ham further alleges that at some point, Plaintiff began discussing a recent incident in the Los Angeles area involving police shootings. Pl's Dep. 19:13-18. Plaintiff does not dispute this allegation, but claims that the discussion was brief and only involved someone asking him if he had heard about the incident, to which Plaintiff replied "no."

At some point, Ham got up to close the door to the conference room. Compl. ¶ 3.9. Plaintiff, seeing Ham move towards the door with the apparent intent to close it, said, "What? You can't handle what I'm saying?" *Id*. ¶ 3.9.

The parties have differing accounts as to who said what to whom over the next 45 seconds.  What is clear is that Ham found Plaintiff sufficiently confrontational to call for court security.

Defendants Dennis Robinson and Casey McEathron, Pierce County Sheriff's Deputies assigned to the Court Security Unit, responded. Robinson Dep. 15:4-5, Ex. 3; McEathron Dep. 6:17-22.  Robinson spoke first with a judicial assistant, who reported that there was an agitated and aggressive man walking in and out of the courtroom, and that Robinson should speak further with Ham. Robinson Dep. 16:7-8, 16:22-25.

Robinson found Ham in the conference room with Spencer. *Id*. 16:9-10.  Ham reported that Plaintiff had been standing outside the conference room and was being "very disruptive," and "laughing about police officers being killed in California." *Id*. 21:11-14.   Ham further reported that he "thought [Plaintiff] was challenging him to a fight and said something resembling" a threat to do bodily harm. *Id*. at 19:17-21. According to Plaintiff, Spencer—who was still in the conference room with Ham—told Robinson that Plaintiff did not threaten Ham. Compl. ¶ 3.13.

After receiving a report from Ham as to Plaintiff's confrontational attitude and threatening words, Robinson exited the conference room and encountered Defendant McEathron, who had separately responded to Ham's call for court security. Dkt. 40.   Both deputies approached Plaintiff in the hallway. *Id*.  At Robinson's request, Plaintiff sat on a bench and relinquished his cane to the deputy. Pl.'s Dep. 30:20-21; Robinson Dep. 23:14-17, 61:1-6.

According to the deputies, Plaintiff's attitude was, almost immediately, "argumentative," "abusive," "vulgar," and non-compliant. Robinson Dep. 25:14-19, 33:13-24, 35:5-24; 57:20-21; McEathron Dep. 13:12-14.   Robinson claims that he attempted to explain to Plaintiff that "[t]here's a certain behavior that is appropriate in the courthouse;" and, from what had been reported, Plaintiff had not been complying with those rules. Robinson Dep. 41:2-10. Plaintiff viewed the discussion differently.  He claims that Robinson "proceeded to just jabber and jab . . . like [Plaintiff was] a child or something . . . And after a while, [Plaintiff] just said, 'Excuse me. Are you done?  Are you going to arrest me?  Am I being detained for any reason or anything?' And [Robinson] said 'No, sir.   You're free to go.'" Pl.'s Dep. 31:9-17.   Robinson returned Plaintiff's cane, and Plaintiff got up from the bench and walked towards the courtroom. *Id*. 72:17-21.

Seeing that Plaintiff was headed not towards the building's exit but towards the courtroom, the deputies followed Plaintiff "to clarify that he was [free] to leave the building based on his overall behavior and his threat to a court official" but, if Plaintiff wanted to remain in the courthouse, "they were not done talking" and Plaintiff "needed to follow court rules and behave appropriately." McEathron Dep. 17:19-24; Robinson Dep. 108:13-22.   According to Robinson, Plaintiff responded that he "was not going to have any more discussion" with the deputies. *Id*. 58:24-25.

6

Robinson "tried to get [Plaintiff] to sit on [another, closer] bench," by gesturing towards it and asking Plaintiff to sit down. *Id*. 61:17, 62:4-7, 70:5-71:25.   Robinson also "repeatedly" asked Plaintiff to hand over his cane. *Id*. 61:17, 62:4-7, 70:5-71:25.   Plaintiff "refused" and Robinson again requested Plaintiff's cane. *Id*. 108:15-16.   When Plaintiff would not hand over his cane, Robinson reached for it; Plaintiff jerked it away. *Id*.   According to Robinson, when Plaintiff jerked his cane away, he "took a defensive stance." *Id*. 107:18-19.   Robinson continued to ask Plaintiff to have a seat. *Id*.

After another couple of seconds, Robinson was looking at Plaintiff's face when he saw "coming up from the side . . . [Plaintiff] raise[] the cane several inches off the ground." Robinson Dep. 67:10-15, 69:5-70:4.   The cane, according to Robinson, "was just coming straight up in [his] general direction.   Not at [him] but indicating it was coming up, and [he] wanted it down." *Id*. 70:2-4.   Thus, as Robinson saw Plaintiff's cane come up, he pushed Plaintiff down on the bench that was behind him, and disarmed him of the cane. *Id*. at 44.   Specifically, Robinson, used his right, open palm to push Plaintiff onto the bench, while simultaneously grabbing Plaintiff's cane with his left hand. *Id*. 67:10-15.

According to Plaintiff, his "cane, at most, came up a few inches" and Robinson "assaulted" Plaintiff when he pushed him onto the bench. Pl's. Opp., Dkt. 43 at 19; Pl's. Dep. 43:14; Compl. ¶ 3.14.   .

Shortly thereafter, Robinson arrested Plaintiff for assault in the third degree, and read Plaintiff his *Miranda* rights.[6] Robinson Dep., Dkt. 38-4, Ex. 2.

---

[6] The charges against Plaintiff were later dismissed.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

#### IV.   LEGAL STANDARD FOR A MOTION FOR SUMMARY JUDGMENT

Summary judgment is proper "if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "[T]he substantive law will identify which facts are material.  Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute about a material fact is "genuine . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In deciding a summary judgment motion, the court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in its favor. *Johnson v. Poway Unified Sch. Dist.*, 658 F.3d 954, 960 (9th Cir. 2011).

#### V.   FOURTH AMENDMENT CLAIMS

Plaintiff claims that, pursuant to 42 U.S.C. Section 1983, Robinson and McEathron violated his Fourth Amendment right to be free from unreasonable seizures when they initially contacted him; and, later, when they arrested him; and his right to be free from excessive force when Robinson pushed him.[7]  Section 1983 is not a source of substantive rights; rather it provides "a method for vindicating federal rights elsewhere conferred." *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979).

---

[7] Plaintiff, in his Complaint, brings all claims against all Defendants. Dkt. 36 ¶ ¶ 4.2-4.10.  Upon examination, it is clear that his Fourth Amendment claims are properly brought only against Robinson and McEathron.

### A. Defendants' Initial Contact with Plaintiff

Plaintiff argues that his initial contact with the deputies amounted to an illegal seizure in violation of his Fourth Amendment rights. *See* Compl., Dkt. 36 ¶ 3.14; Pl's. Opp., Dkt. 43 at 14. Plaintiff's argument is two-fold.  First, Plaintiff asserts, he was seized at some point during his conversation with Robinson and McEathron because a reasonable person would not have felt free to leave a conversation with armed deputies. Dkt. 43 at 15.  Second, Plaintiff asserts, the seizure was unlawful because it was "based entirely" on Ham's statement to Robinson that Plaintiff had threatened him. Dkt. 43 at 14.  Robinson, Plaintiff maintains, "ignored" Spencer's statement that Plaintiff had not, in fact, threatened Ham. *Id*.  Thus, Plaintiff argues, to the extent that Robinson had articulable suspicion that criminal activity was afoot, his suspicion was not reasonable. *See id*.

The Fourth Amendment provides for the right to be secure in one's person "against unreasonable searches and seizures." U.S. Cons. Amend. IV. Therefore, in order to survive Defendants' summary judgment motion on his Fourth Amendment claim, Plaintiff must raise a triable issue of fact that: (1) he was seized, and (2) the seizure was unreasonable. *United States v. Mendenhall,* 446 U.S. 544, 553 (1980).

> 1.    *Did the initial contact constitute a seizure under the Fourth Amendment?*

An individual is seized, for Fourth Amendment purposes "if 'taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" *United States v. Washington*, 490 F.3d 765, 769 (9th Cir. 2007) (quoting *Florida v. Bostick,* 501 U.S. 429, 437 (1991)).

Here, Plaintiff complied with Robinson's request to relinquish his cane and sit down. The deputies remained standing on either of side of him; and, of course, Plaintiff uses his cane to help him walk. Plaintiff, therefore, reasonably felt he was not free to leave. Accordingly, Plaintiff was seized for Fourth Amendment purposes.[8] *See, e.g.*, *United St ates v. Mendenhall*, 446 U.S. 544, 553 (1980) (a person is seized for Fourth Amendment purposes when his "freedom of movement is restrained").

> 2.    *Was the seizure reasonable?*

Having determined that Plaintiff was seized for purposes of the Fourth Amendment, the Court must now determine if the seizure was reasonable. A seizure is reasonable for purposes of the Fourth Amendment, if the officer's action is supported by reasonable suspicion to believe that criminal activity may be afoot." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (internal quotations omitted). To make reasonable-suspicion determinations, courts must examine the "totality of the circumstances" to determine whether the detaining officer has a "'particularized and objective basis' for suspecting legal wrongdoing." *Id*. (quoting *United States v. Cortez*, 449 U.S. 417-418 (1981)). Courts must give "due weight" to factual inferences drawn by officers, who properly rely upon their experience and specialized training. *See id*. (citing *Cortez*, 449 U.S. at 418; and *Ornelas v. United States*, 517 U.S. 690, 699 (1996)). While more than a "hunch" is needed to justify a stop, *Terry*, 392 U.S. at 27, "it may be the essence of good police work to adopt an intermediate response." *Adams v. Williams*, 407 U.S. 143, 146 (1972).

Here, Robinson and McEathron arrived pursuant to a request for security to respond to an agitated, aggressive, and disruptive man. Once on scene, Robinson encountered a judicial assistant who reported that there was an agitated and aggressive man walking in and out of the

---

[8] Plaintiff's assertion that he was seized solely by virtue of conversing with armed officers is incorrect. *See, e.g*., *United States v. Washington*, 490 F.3d 765, 770 (9th Cir. 2007).

courtroom.  Robinson then spoke to Ham who reported that Plaintiff had been loud, using vulgar language, laughing about police officers being killed, and, most importantly, had threatened him. Even assuming Spencer told Robinson that Plaintiff did not, in fact, threaten Ham, it was Robinson's job as a court security officer to investigate a reported threat. *See, e.g.*, *Adams*, 407 U.S. at 146; *Hendricks v. Pierce County*, 2015 WL 6031646 at *3 (W.D.Wash. Oct. 15, 2015). Moreover, the report came from a fellow county employee with whom Robinson was familiar. Accordingly, Robinson had reasonable suspicion to believe that criminal activity, namely criminal threats, RCW 9A.84.030(1)(a), or disorderly conduct, RCW 9A.76.020, was afoot. *See*, *e.g.*, *Navarette v. California*, 134 S.Ct. 1683, 1690 (2014) (officers had reasonable suspicion criminal activity was afoot based on anonymous 911 call reporting suspected criminal behavior); *Hendricks*, 2015 WL 6031646at *3 (deputy had reasonable suspicion criminal activity was afoot after receiving report from fellow deputy that plaintiff had been violating courthouse's decorum rules prohibiting filming in the courtroom).  Given the above scenario, the deputies' brief seizure of Plaintiff was proper.

### B.     Robinson's Use of Force

Next, Plaintiff argues that Robinson's push constituted excessive force in violation of his Fourth Amendment rights. *See* Dkt. 36 ¶ 3.14.  Specifically, Plaintiff asserts that he did not pose a threat to the deputies or anyone else in the courthouse; therefore, Robinson's push was impermissibly excessive because "a reasonable officer could not believe that shoving a disabled man against a wall for no apparent reason" is constitutional. Dkt. 43 at 18.  Defendants counter that Robinson used *de minimus* force that was objectively reasonable. Dkt. 37 at 22-25. Alternatively, Defendants argue, even if Robinson's force was excessive, he is nevertheless

entitled to qualified immunity because a reasonable officer on scene could have properly believed the push would not violate a clearly established constitutional right.

### 1.     *Amount of Force*

The force used during an investigatory stop, arrest, or other seizure is "analyzed under the Fourth Amendment's 'objective reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 388 (U.S. 1989).   Where an officer's use of force is reasonable, there is no constitutional violation. *Id*. at 397.   The reasonableness of the use of force must "be assessed by carefully considering the objective facts and circumstances that confronted the arresting officer or officers." *Chew v. Gates,* 27 F.3d 1432, 1440 (9th Cir.1994).   Thus, courts must judge reasonableness "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396.   The Supreme Court has emphasized "that there are no per se rules in the Fourth Amendment excessive force context; rather, courts 'must still slosh [their] way through the factbound morass of reasonableness.'" *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) (quoting *Scott v. Harris*, 550 U.S. 372, 383 (2007)).   "In short, an officer's use of force must be objectively reasonable based on his contemporaneous knowledge of the facts." *Deorle*, 272 F.3d at 1281.

Here, the morass of relevant facts, as supported by the parties' testimony and the County Courthouse's video footage, is as follows:  During the initial contact between Plaintiff and the deputies, the parties miscommunicated.  Specifically, Plaintiff felt the deputies were treating him like a child; Robinson, meanwhile, felt that his attempts to explain the courthouse's decorum rules fell on deaf ears.  After approximately two minutes, Robinson told Plaintiff he was free to leave and handed Plaintiff his cane.  There is nothing in the record to suggest that Robinson knew that Plaintiff was waiting for a court hearing that had not yet happened.  Thus, Robinson

made a reasonable mistake of fact in assuming that Plaintiff understood Robinson's affirmative answer to mean that Plaintiff was free to leave *the building*.  Therefore, upon seeing Plaintiff walk toward the courtroom rather than the courthouse exit, the deputies moved to intercept and speak to Plaintiff again.

The record demonstrates that Robinson repeatedly attempted to get Plaintiff to once again sit on a bench and to hand over his cane, requests that Plaintiff ignored.  At some point, Robinson reached for the cane and Plaintiff jerked it away. Plaintiff, who had previously refused to turn around, then turned towards Robinson.  Robinson did not immediately move towards Plaintiff; instead, the video shows that Robinson continued to gesture at the bench, making small hand movements and putting his left arm out in a guiding motion towards the bench.

Seconds later, Plaintiff transferred the cane from his left hand to his dominant, right hand. According to Robinson, out of his peripheral vision, he saw the bottom of Plaintiff's cane coming up off the ground.  Considering the facts in the light most favorable to Plaintiff, the "cane at most, came up a few inches." Pl's. Opp., Dkt. 43 at 19.  When Plaintiff's cane "came up," Robinson pushed Plaintiff with his open palm and grabbed the cane with his other hand. The push and disarmament lasted one second.  Once Robinson had the cane, he immediately dropped it onto the floor, kicked it to McEathron, who himself kicked it out of reach of all three men.

At the time of the push, Plaintiff was standing directly in front of the bench.  Thus, when Robinson pushed him, Plaintiff fell onto the bench and into a normal, seated position.  The video discloses that Plaintiff was not, as Plaintiff alleges in his briefing, "shoved against a wall." *Compare* Dkt. 40 *with* Dkt. 43 at 18.  One second after being pushed, Plaintiff removed from his lap the coat he had been holding, draped his left arm over the back of the bench, and crossed his

13

left leg over his right.  Plaintiff did not make any movements indicating he was physically injured after having been palm-pushed.

As discussed above, this Court must analyze Robinson's use of force under the "'objective reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 388 (U.S. 1989).  In other words, was Robinson's use of force reasonable "considering the objective facts and circumstances that confronted him[?]" *Id*.  The Court must bear in mind that "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Id*. at 396.  Here, in light of the circumstances described above, the Court concludes that Robinson's brief, non-injuring use of force was *de minimus* and objectively reasonable. *See id*.; *see also Jackson v. City of Bremerton*, 268 F.3d 646 (9th Cir. 2001) (use of chemical spray to arrestee's head in response to her interference with another person's arrest constituted objectively reasonable force); *Forrester v. City of San Diego*, 25 F.3d 804 (9th Cir. 1994) (use of "pain compliance techniques" to arrest protestors was minimal and constituted objectively reasonable force); *Eberle v. City of Anaheim*, 901 F.2d 814, 820 (9th Cir. 1990) (use of a painful "finger control hold" to remove belligerent spectator constituted objectively reasonable force).  Where an officer's use of force is reasonable, there is no constitutional violation. *Graham*, 490 U.S. at 397.  Accordingly, Plaintiff did not suffer a Fourth Amendment violation from Robinson's push.[9]

## C.    Robinson's Arrest of Plaintiff

Plaintiff argues that his arrest by Robinson for assault in the third degree was an unlawful seizure. *See* Dkt. 36 ¶ 3.14.  Specifically, Plaintiff alleges, he did "not even come close" to assaulting Robinson because his "cane, at most, came up a few inches;" and, therefore, Robinson

---

[9] Defendants also move for summary judgment on the grounds that Robinson is entitled to qualified immunity for his use of force.  Since the force used was objectively reasonable, the Court need not consider this issue.

lacked probable cause to arrest him. Pl's. Opp., Dkt. 43 at 19.   Additionally, Plaintiff asserts, Robinson did not have probable cause to arrest Plaintiff for any other offense.   Defendants, in their motion, argue that Robinson had probable cause to arrest Plaintiff for assault in the third degree because Robinson witnessed Plaintiff commit this crime (*i.e.* raise the cane as if to strike Robinson). Dkt. 37 at 27-28.   Additionally, Defendants argue, Robinson had probable cause, and therefore could have lawfully arrested Plaintiff, for felony harassment, disorderly conduct, or obstructing law enforcement.   Alternatively, Defendants argue, even in the absence of probable cause, a reasonable police officer could have believed that arresting Plaintiff for any of these offenses was lawful.   Thus, Defendants assert, even if Robinson was mistaken, he is entitled to qualified immunity for the arrest.

### 1.   Probable Cause

"Under the Fourth Amendment, a warrantless arrest requires probable cause." *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007) (citing *Michigan v. Summers*, 452 U.S. 692, 700 (1981).  Probable cause to arrest exists when "under the totality of circumstances known to the arresting officers, a prudent person would have concluded that there was a fair probability that the [individual] had committed [or is committing] a crime." *United States v. Smith,* 790 F.2d 789, 792 (9th Cir.1986).  Thus, courts are to "examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause" at the time of the arrest. *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (internal quotation omitted); *see also Hart v. Parks*, 450 F.3d 1059 (9th Cir. 2006).   "[P]robable cause exists where there is probable cause to arrest for any criminal offense existing under a specific criminal statute at the time of arrest." *Evans v. City of*

*San Diego,* 913 F. Supp. 2d 986, 994 (S.D. Cal. 2012) (citing *Devenpeck v. Alford,* 543 U.S. 146, 153–155 (2004)).

Viewing the circumstances surrounding Plaintiff's arrest "from the standpoint of an objectively reasonable police officer," the Court concludes that Robinson had probable cause to arrest Plaintiff. *See Pringle,* 540 U.S. at 371.   Robinson had heard reports—and witnessed himself—that Plaintiff was acting in an agitated, disruptive manner.   When Robinson approached Plaintiff, he repeatedly refused to hand over his cane and then moved towards Robinson in an aggressive manner. Therefore, the Court concludes that an objectively reasonable police officer could have concluded that Plaintiff either had or was about to commit a crime, thus giving Robinson probable cause to arrest Plaintiff. "Armed with probable cause, an officer may arrest a citizen without a warrant even if the offense is minor." *Goldsmith v. Snohomish,* 558 F. Supp. 2d 1140, 1152-53 (W.D. Wash. 2008) (citing *Atwater v. City of Lago Vista,* 532 U.S. 318, 354 (2001)).   Accordingly, Plaintiff's arrest was lawful.

## 2.   *Qualified Immunity*

"Even absent probable cause, qualified immunity is available if a reasonable police officer could have believed that his or her conduct was lawful, in light of clearly established law and the information the [arresting] officers possessed." *Fuller v. M.G. Jewelry*, 950 F.2d 1437, 1443 (9th Cir. 1991) (citing *Anderson v. Creighton,* 483 U.S. 635, 641 (1987)). Qualified immunity exempts government officials from liability unless their conduct "violate[s] clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982).   "In determining whether a right was 'clearly established,' the court considers whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Garcia v. Cty. of Merced*, 639 F.3d 1206, 1208 (9th

Cir. 2011).  Thus, courts must ask whether the right's "contours were 'sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *Mattos v. Agarano*, 661 F.3d 433, 442 (9th Cir. 2011) (quoting *Ashcroft v. al-Kidd,* 563 U.S. 731, 740 (2011)).  "Thus, even if the officers were mistaken that probable cause to arrest [the suspected] existed, they are nonetheless immune from [suit and thus] liability if their mistake was reasonable." *Id*.

Here, in light of the surrounding circumstances, a reasonable officer could have mistakenly believed, based both on statements from persons involved, including a prosecuting attorney, as well as the officer's own interactions with Plaintiff, that probable cause existed for any of following offenses: assault in the third degree; disorderly conduct; and obstructing law enforcement.  Thus, "reasonable officers in Defendants' position would not have clearly known that the arrest was unlawful under the circumstances." *Evans v. City of San Diego*, 913 F. Supp. 2d 986, 996 (S.D. Cal. 2012); *see also Ibarra v. Snohomish Cty.*, 2016 WL 4193863, at *7 (W.D. Wash. Aug. 9, 2016).   Accordingly, Robinson is entitled to qualified immunity for the arrest of Plaintiff.

## VI.   FIRST AMENDMENT CLAIM

Plaintiff argues that, pursuant to 42 U.S.C. Section 1983, Defendants deprived him of his right of free speech under the First Amendment. Dkt. 36 ¶ 4.3.  In his Complaint, Plaintiff does not allege any facts that can fairly be construed as pertaining to a First Amendment claim. *See generally id*.  In his briefing, Plaintiff states that "rather than simply close his door and carry on with his business, Ham . . . verbally engage[d]" with Plaintiff, and "[h]is exchange with [Plaintiff] led to Ham calling security." Dkt. 43 at 21.  Thus, Plaintiff asserts, "[i]t was obvious in this context that Ham opposed [Plaintiff's] views," and his "attempts to curtail" Plaintiff's

speech amounted to unreasonable efforts to suppress Plaintiff's expression.  Similarly, Plaintiff asserts, Robinson "interfered" with Plaintiff's expression of speech "because he did not [like Plaintiff's] attitude or the fact that Plaintiff was talking during the entire exchange." *Id*.

"In order to demonstrate a First Amendment violation, a plaintiff must provide evidence showing that 'by his actions [the defendant] deterred or chilled [the plaintiff's] political speech and such deterrence was a substantial or motivating factor in [the defendant's] conduct." *Mendocino Envtl. Ctr. v. Mendocino Cty.*, 192 F.3d 1283, 1300 (9th Cir. 1999) (quoting *Sloman v. Tadlock,* 21 F.3d 1462, 1469 (9th Cir.1994)).

Plaintiff has provided no such evidence.  In fact, Plaintiff's briefing does not cite to any portion of the record. *See* Dkt. 43 at 20-21.  Neither can the Court find any evidence to suggest that either Ham or Robinson acted to deter or chill Plaintiff's speech, or that Plaintiff engaged in any speech that could be characterized as remotely political.   Accordingly, Plaintiff's First Amendment claim is dismissed.

## VII.   FIFTH AND FOURTEENTH AMENDMENT CLAIMS

Plaintiff brings claims pursuant to 42 U.S.C. Section 1983 on the grounds that Defendants deprived him of his due process rights under the Fifth and Fourteenth Amendments. Dkt. 36 ¶ 4.3.  Defendants, in their motion, assert that these claims are merely restatements of Plaintiff's First and Fourth Amendment claims. Dkt. 37 at 36.  Further, Defendants assert, "when a particular constitutional amendment 'provides an explicit textual source of constitutional protection . . . that amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims." *Id*. (quoting *Albright v. Oliver*, 510 U.S. 266, 281 (1994)).   Thus, Defendants argue, Plaintiff's due process claims should be dismissed. *Id*. Plaintiff does not respond to this argument in his opposition or in any other briefing.  In any

event, Defendants are correct.   Accordingly, Plaintiff's Fifth and Fourteenth Amendment due process claims are dismissed.

## VIII.   CLAIMS FOR *MONELL* LIABILITY

Plaintiff also alleges that Pierce County, its Prosecuting Attorney's Office, and its Sheriff's Office are liable for Robinson's actions in this case. Dkt. 36.  A plaintiff may not sue a municipality or other local government entity based on the theory of *respondeat superior*; rather, it must demonstrate that the constitutional deprivation at issue resulted from the government entity's policies or customs.  *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978).  To satisfy this requirement, the plaintiff must point to specific policies, customs, or patterns of practice which could reasonably have led to the violation at issue.  *Id.*

Plaintiff has provided no such evidence.  Instead, Plaintiff asserts, "this situation falls into the line of cases holding that an 'unusually egregious incident' can create an inference of inadequate training or supervision." Dkt. 43 at 11 (citing *Martini v. Russell*, 582 F.Supp. 136, 142 (C.D. Cal. 1984); *Turpin v. Mailet*, 619 F.2d 196, 202 (2d Cir. 1980)).  Robinson's actions, Plaintiff asserts, were unusually egregious.  Thus, Plaintiff argues, the County and its named offices are liable for Robinson's actions.

Plaintiff's cited cases involve readily distinguishable facts.  In *Turpin*, the Court noted that "a single, unusually brutal or *egregious beating administered by a group of municipal employees* may be sufficiently out of the ordinary" to give rise to *Monell* liability. 619 F.2d 196, 202 (2d Cir. 1980) (emphasis added).  In *Martini*, government employees arrested a woman for various traffic violations and, in violation of established regulations, locked her minor children in a detention cell with her. 582 F.Supp. 136, 141-142 (C.D. Cal. 1984).  For the many reasons explained *supra*, Robinson's actions were reasonable and his push was not egregious.  Moreover,

pursuant to his role as a county Deputy Sheriff, Robinson underwent *inter alia*, the state's basic training; sixteen weeks of field training; and, annually, forty hours of in-service training, including defensive tactics, use of force, and legal updates. Robinson Decl., Dkt. 47.   In the absence of any allegations concerning Pierce County's policies, customs, or patterns, Plaintiff's *Monell* claims are dismissed.

## IX.   CLAIMS AGAINST THE JANE DOE "SPOUSES"

Plaintiff, in his Complaint, alleges that various "Jane Does" are liable for the actions of their husbands, Ham, Robinson, and McEathron, respectively. Dkt. 36 (citing *Clayton v. Wilson*, 168 Wash. 2d 57 (2010)). These claims must be dismissed. The Complaint does not specify whether the Defendants are married and Plaintiff has not sought to amend the complaint to name specific spouses.   What is more, the alleged violations occurred over three years ago. Accordingly, the statute of limitations for Plaintiff's personal injury claims with respect to any spouses has run. See *Jones v. Blanas*, 393 F.3d 918, 927 (9th Cir. 2004); RCW 4.16.080(2). Therefore, Plaintiff's claims against the Jane Doe "spouses" are dismissed.

## X.   STATE LAW CLAIMS

Plaintiff alleges that Defendants committed the torts of battery, false arrest, false imprisonment, and intentional infliction of emotional distress.   Having dismissed Plaintiff's § 1983 claims, the Court will not exercise supplemental jurisdiction over these claims. *See, e.g.*, *Acri v. Varian Associates, Inc.*, 114 F.3d 999, 1000 (9th Cir.), *supplemented*, 121 F.3d 714 (9th Cir. 1997), *as amended* (Oct. 1, 1997).   Accordingly, Plaintiff's state law claims are dismissed without prejudice.

## XI.   CONCLUSION

NOW, THEREFORE, IT IS HEREBY ORDERED THAT:

1.  Defendants' Motion to Strike is GRANTED;

2.  Defendants' Motion for Summary Judgment is GRANTED with respect to the 42 U.S.C. Section 1983 claim based on the deputies' initial seizure of Plaintiff; the use of force claim; the arrest claim; the suppression of speech claim; the due process claims; and the *Monell* claim;

3.  Plaintiff's claims against the "Jane Doe" spouses are DISMISSED;

4.  Plaintiff's state law claims are DISMISSED without prejudice based on the Court's refusal to exercise supplemental jurisdiction;

5.  This case is DISMISSED.

DATED this the 21st day of November, 2016.

_____
BARBARA J. ROTHSTEIN
UNITED STATES DISTRICT JUDGE